# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **RITA WHITE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No. 3:11-cv-0607** |
| **v.** ) | **Judge Aleta A. Trauger** |
| ) | |
| **METROPOLITAN GOVERNMENT OF** ) | |
| **NASHVILLE AND DAVIDSON COUNTY,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM

Defendant Metropolitan Government of Nashville and Davidson County ("Metro Nashville") has filed a Motion for Summary Judgment (Docket No. 32), to which the plaintiff, Rita White, has filed a Response in opposition (Docket No. 43), and Metro Nashville has filed a Reply (Docket No. 47).[1]  For the reasons stated herein, Metro Nashville's motion will be granted in part and denied in part.

## BACKGROUND

White worked within the Metro Nashville Police Department ("MNPD") from 1981 to 2010.  During the period of time relevant to this lawsuit, she worked within the MNPD's

---

[1]In support of its motion, Metro Nashville filed a Memorandum of Law (Docket No. 33), a Statement of Material Facts Not in Dispute (Docket No. 28) (with attached exhibits), the Declaration of Karl Roller (Docket No. 29), the Declaration of Robert Tindall (Docket No. 30), and a manually filed audio CD (Docket No. 36).  In support of her Response thereto (itself a Memorandum of Law), White filed a Notice attaching various exhibits (Docket No. 40), a Response to Metro Nashville's Statement of Additional Material Facts Not in Dispute (Docket No. 41), and a Statement of Additional Disputed Facts in Opposition to Metro Nashville's motion (Docket No. 42).  In support of its Reply, Metro Nashville filed a Response to White's Statement of Additional Material Facts Not in Dispute (Docket No. 46), which attached additional exhibits.

warrants division as a Warrant Clerk.  Warrant Clerks perform a number of functions, including filing warrants, preparing reports, pulling warrants, and answering radio calls from police officers requesting warrant checks.  (*See* Docket No. 40, Ex. A, Affidavit of Rita White ("White Aff."), Ex. 1 thereto).[2]  For an unspecified period of time, White worked as a Warrant Clerk on the night shift, during which she performed all of these specified duties.

At an unspecified point in or before 2001, White bid for and received a position as a Warrant Clerk on the day shift, under the assumption that she would be able to rotate through the various Warrant Clerk roles.[3]  However, when White took the day shift job, she was assigned primarily to work radio duty and seldom rotated positions.  According to White, the radio position, unlike other Warrant Clerk rotations, is physically isolating (the radio operator is confined to the radio room) and highly stressful.  Soon after taking the day shift position, White made numerous requests to her supervisors to join the Warrant Clerk rotation, all of which were denied.

In October 2006, while White was on radio duty, she received a call from a police officer seeking to verify a warrant.  Within a matter of seconds, White purported to confirm to that officer that the individual to be served was the correct person identified on the warrant.

---

[2]The exhibits to the White Affidavit were docketed within Docket No. 40 under entry numbers 1 (White Aff. exhibits 1-13) and 2 (White Aff. exhibits 14-23).

[3]Metro Nashville, supported by the deposition testimony of certain of White's supervisors, argues that White's belief that she would have the opportunity to rotate positions on the day shift was unfounded.  They argue that the position was only available because the previous radio operator had died and that they hired White specifically to assume that former radio operator's role.  They also argue that the day shift employees did not typically rotate positions.  However, White contests both of these facts, averring (1) that she reasonably believed, based at least in part on the Warrant Clerk job description for which she applied, that the day shift Warrant Clerk would assume multiple roles and responsibilities, and (2) that the day shift Warrant Clerks (other than her) typically rotated positions.

However, this statement was erroneous: the officer arrested the wrong person, who ultimately filed a lawsuit in October 2007 against Metro Nashville (and various other parties) stemming from that incident. *See Milligan v. United States*, 670 F.3d 686 (6th Cir. 2012). White was not named as a party to the *Milligan* lawsuit. In fact, White's supervisors have testified that they did not even know of White's role in the underlying incident until after the *Milligan* lawsuit was filed, at which point Metro Nashville conducted an internal investigation. Indeed, notwithstanding the October 2006 incident, White received an acceptable employment evaluation from her supervisor, Lieutenant Robert Tindell, for the year 2006 and received an acceptable employment evaluation from a different supervisor, Sergeant Mark Garafola, for the year 2007.

White continued to request the opportunity to rotate to other roles, as she maintained other Warrant Clerks had been permitted to do. However, at least as of 2007, Lieutenant Tindall and Sergeant Garafola informed her that she could not perform any function other than radio duty because she was dyslexic and/or had Attention Deficit Hyperactivity Disorder ("ADHD"). Although White admits that she has ADHD, she avers that she is not dyslexic, steadfastly maintains that she did not tell any supervisors or co-workers that she is dyslexic, and claims to have informed her supervisors that she is not dyslexic and could have performed other Warrant Clerk functions.[4] Despite White's protestations, Lieutenant Tindall and Sergeant Garafola

---

[4]Metro Nashville, citing to testimony from certain co-workers and supervisors, contends that White actually told others in her department that she was dyslexic. However, some of the cited testimony is ambiguous on this point; also, it does not appear that White's supervisors contemporaneously documented that White had professed to be dyslexic. However, White maintains that she never told anyone that she was dyslexic. (*See, e.g.*, Docket No. 40, Ex. D, 8/8/12 White Dep. 69:1-8 ("Q: Do you have any memory of ever telling anybody in warrants that you were dyslexic? A: No. Q: So if people say, ['] Rita White told me all the time that she was dyslexic,['] they would be lying? A: Yes. . . . I'm not [dyslexic], so I don't know why I would tell them that.")

continued to deny White the opportunity to join the rotation, at least in part on the basis that her dyslexia would hinder her ability to perform these other job duties.[5] Furthermore, Lieutenant Tindall stated in front of other co-workers that White was dyslexic, which White construed as an attempt to sully her reputation in the workplace.

In 2008, White made additional requests to rotate to positions other than radio duty, which Sergeant Garafola and/or Lieutenant Tindall denied on the basis that White was dyslexic. During that same time frame, when White sought to take a bathroom break, the other Warrant Clerks refused to step in and cover the radio, which White attributed to the negative perceptions that her co-workers formed after hearing negative comments about her from her supervisors. In connection with that incident, one of White's co-workers ordered her to bring a radio transmitter with her into the bathroom so that she would not miss any calls, which she found to be a demeaning deviation from typical practice and which a former co-worker described as "comical." (*See* Docket No. 40, Ex. G, Donya King Dep. at 23:4-5.) The MNPD later disciplined the MNPD employee who gave that order. (*See* Docket No. 40, Ex. E, Roller Dep. 19:14-23.)

At some point in the first half of the year 2008, White alleges that Sergeant Garafola

---

[5]Again, the parties dispute the reasons why White was largely confined to radio duty. White has repeatedly testified that her supervisors told her that she could not perform other duties because she was dyslexic. Metro Nashville argues that White was confined to radio duty because she had ADHD, a condition that she admits she has, and/or because they did not believe she could handle the other roles based on her past job performance. However, even apart from White's testimony, the record contains potentially inconsistent accounts from White's supervisors about why she was not permitted to rotate roles. For example, one of White's superiors, Captain Karl Roller, testified that he had *not* limited White to radio duty on the basis that she had ADD and/or had dyslexia (*see* Docket No. 40, Ex. E, Roller Dep. 18:11-16); however, in an internal July 2008 email, Captain Roller had previously stated that, to avoid the risk of White's making errors that could lead to corrective action against her and/or departmental liability, it was "in the interest of both parties" to restrict her to radio duty precisely *because* she had "ADHD and dyslexia" (*id.*, Ex. B at p. 3).

began falsely accusing her of not adequately performing her job duties. According to White, he made these accusations in a loud and disrespectful manner and sometimes made them in front of other employees. White contends that these accusations contributed to a hostile work environment in which her co-workers treated her as a "less than" and shunned her because of her perceived disabilities.

A co-worker of White's, Officer Clifford Mann, offered deposition testimony that corroborates some of White's testimony about Sergeant Garafola. (*Id.*, Ex. R, Mann Dep. 15:2-16:1; 21:1-24:23.) Officer Mann testified that Sergeant Garafola made "disparaging" and "unfavorable" remarks about White, singled her out for particularized negative treatment, and treated other employees more favorably than White. In his opinion, "that kind of behavior [Garafola's] can drive a person to a point where it can be so uncomfortable on the job that they would want to leave, yes." (*Id.* 24:7-20.)

In June 2008, White filed a grievance against Sergeant Garafola, in which she contended that, due to Sergeant Garafola's conduct, she was "being harassed and subject to a hostile work environment" for seven enumerated reasons. (White Aff., Ex. 4.) Lieutenant Tindell initially handled the grievance and found all but one of White's seven enumerated complaints to be without merit. In July 2008,White appealed Lieutenant Tindall's decision to a Grievance Panel, to which she argued that she was being falsely accused of failing to perform job duties and that her supervisors had unfairly denied her requests to rotate positions on the (unjustified) basis that she had dyslexia. Although the Grievance Panel denied the appeal, it recommended that White "should be offered the opportunity to rotate to job assignments such as warrant entry, if she feels she can perform these duties in an acceptable manner." (Docket No. 40, Ex. 4.) After several

further administrative appeals, White's grievances were ultimately denied. Following the last of these appeals, she signed a document on August 18, 2008, acknowledging receipt of the final determination of her grievance against Sergeant Garafola.

Notwithstanding the Grievance Panel's recommendation, White was not permitted to rotate positions for the remainder of her employment at the MNPD, despite numerous requests to do so. Again, White avers that her supervisors informed her that she could not rotate positions because she was dyslexic. Furthermore, White contends that, after she filed the grievance against Sergeant Garafola, his disparaging conduct towards her increased in severity.

On August 18, 2008 – the same day that she was asked to sign the final denial of her grievances against Sergeant Garafola – White received a formal notice that she was being charged with a policy violation relating to her conduct in October 2006 (nearly two years earlier) in connection with the false arrest of Paula Milligan. Prior to receiving that notice, no one at MNPD had interviewed her about the incident or indicated that she could face disciplinary action. Despite Lieutenant Tindall's suggestion that she accept a four-day suspension for that alleged violation, White refused to settle the matter and requested a disciplinary hearing.

While her request for a disciplinary hearing was pending, White filed a formal charge of disability discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 4, 2008. (White Aff., Ex. 10) ("First EEOC Charge").[6] White contends that the discrimination and harassment against her continued, including being forced by a co-worker to carry her radio into the bathroom.

_____

[6] On October 24, 2008, shortly before filing the First EEOC Charge, White had also filed an online complaint with the EEOC, alleging disability discrimination. (White Aff., Ex. 9.)

On December 11, 2008 – five weeks after filing the First EEOC Charge – White received a notification that her upcoming disciplinary hearing would take place in January 2009. However, that scheduling notification also informed her that she was now being charged with *two* policy violations related to the October 2006 Milligan incident: (1) her previous charge, for which the MNPD continued to seek a four-day suspension, and (2) a new charge based on the same conduct, for which the MNPD sought an additional three-day suspension.

On December 18, 2008 – approximately six months after filing her grievance against Sergeant Garafola and six weeks after filing the First EEOC Charge against the MNPD – Sergeant Garafola gave White a negative performance evaluation, which rated her performance substantially lower than in previous years and, under a performance plan, initially obligated her to attend multiple classes related to workplace etiquette.

On January 14, 2009 – approximately 10 weeks after filing the First EEOC charge – White appeared for the departmental hearing concerning the two policy violations related to her October 2006 conduct. The MNPD found that both violations were merited and ordered her to serve an immediate seven-day suspension, without affording her the opportunity to utilize accrued vacation days or to postpone serving the suspension.[7] That day, White filed another formal EEOC Charge ("Second EEOC Charge"), in which she alleged that she was facing both discrimination and retaliation for engaging in protected activity. (White Aff., Ex. 15.)

---

[7]According to Captain Roller, under MNPD policy, a suspension over five days cannot be taken from available vacation days but, instead, must come out of an employee's pay. (*See* Roller Decl. ¶ 10.) Captain Roller also avers that he and Lieutenant Tindall initially recommended only the 4-day suspension on a single charge, and that it was actually a "department advocate" within the MNPD's Administrative Service Bureau who subsequently decided to add the second charge.

On February 6, 2009, the MNPD rescinded the substandard evaluation that Sergeant Garafola had issued to White in December 2008, on the basis that Sergeant Garafola had not properly documented the bases for his complaints about White's allegedly substandard conduct.

On April 6, 2009, White appeared for a hearing before the Civil Service Commission concerning her appeal of the seven-day suspension. The Civil Service Commission found that White, in fact, had violated MNPD policy in October 2006 by not properly verifying the warrant but also found that the seven-day penalty was "excessive," because it unfairly punished White twice for what was essentially a single offense. (White Aff., Ex. 18, Initial Order, *In re Rita White.*) Accordingly, White's suspension was reduced to four days. The Civil Service Commission decision explicitly did not address (1) whether, with respect to various potentially culpable parties to the October 2006 incident, "someone else should have been disciplined" in addition to White (*id.* at p. 6 n.2); and (2) whether the MNPD had added the second charge as retaliation for White requesting a Civil Service Commission hearing with respect to the initial charge (*id.* at p. 8). No other MNPD employees who played a role in the wrongful arrest of Paula Milligan in 2006 received a suspension.

White avers that, due to the stress caused by the discrimination and retaliation she experienced, her physical and mental condition suffered, leading her to file for (and receive) a Metro medical disability pension, effective January 1, 2010.[8]

On July 21, 2011, the EEOC issued a right to sue letter concerning the First EEOC Charge, with respect to which it made no findings. Notably, on July 30, 2011, White received a

---

[8]Notably, in her Disability Pension Questionnaire, it appears that White did not specifically reference diabetes or ADHD as a basis for seeking a disability pension. (White Aff., Ex. 20.)

"Determination" from the EEOC with respect to the Second EEOC Charge. In that Determination, the EEOC found that the MNPD knew about the wrongful *Milligan* arrest in the Fall of 2006, that White was not the only person responsible for that incident, that the MNPD took no action against White or any other responsible individual at the time, and that White was unfairly disciplined and suspended only after filing an EEOC charge two years later. Accordingly, the EEOC determined that "evidence exists to establish that the [MNPD] retaliated against [White], and the reasons given for her disciplining was pretext." (White Aff., Ex. 23.)

The parties were not able to resolve the matter through EEOC dispute resolution procedures, after which White filed this lawsuit against Metro Nashville. White asserts claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, for (1) failure to accommodate; (2) discrimination; (3) hostile work environment; and (4) retaliation. Metro Nashville has moved for summary judgment on all of these claims.

## STANDARD OF REVIEW

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2013). At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its burden by showing that there is an absence of evidence to support the non-moving party's case. *Id.* (citing *Celotex*, 477 U.S. at

325).  "When the moving party has carried this burden, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).)  The non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.  *Id.*

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'"  *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  "In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party."  *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).  But "[t]he  mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient," *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at 252), and the non-movant's proof must be more than "merely colorable."  *Anderson*, 477 U.S. at 249.  An issue of fact is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party.  *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).

## ANALYSIS

### I.     Failure to Accommodate Claim

Although White's opposition brief references case law concerning a "failure to accommodate" disability claim, the court agrees with Metro Nashville that this case does not present circumstances implicating that type of ADA claim.  At her deposition, White stated that

she had never sought an accommodation from the MNPD and does not seek redress through this lawsuit for a failure to accommodate; indeed, she avers that she was not disabled in the first place. Thus, the court will dismiss the failure to accommodate claim with prejudice.

## II.   Discrimination Claim

### A.   Statute of Limitations

An individual seeking to assert an ADA claim must comply with the administrative exhaustion procedures set forth in 42 U.S.C. § 2000e-5(e) (2013), under which a plaintiff must file an EEOC charge within 180 days of the alleged unlawful employment practice or, if the plaintiff has instituted proceedings with a state or local agency, within 300 days. *See* 42 U.S.C. § 12117 (2013) (incorporating 42 U.S.C. § 2000e-5); *Williams v. Nw. Airlines, Inc.*, 53 F. App'x 350, 351-52 (6th Cir. 2002).[9]

As an initial matter, the parties do not appear to agree on whether the 180-day limitation or the 300-day limitation applies here. Under § 2000e-5(e), the 180-day limitation applies "except in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof. . . . ." The purpose of this exception is to provide so-called "deferral states" time to act upon a discrimination complaint. *See Jackson v. Richards Med. Co.*, 961 F.2d 575, 578 (6th Cir. 1992) (ADEA); *El-Zabet v. Nissan N. Am., Inc.*, 211 F. App'x 460, 463 (6th Cir. 2006) (Title VII). Tennessee is a deferral state that, pursuant to the Tennessee Human Rights Act,

---

[9]Once a plaintiff receives a right-to-sue letter from the EEOC, the plaintiff then must commence a civil suit within 90 days. 42 U.S.C. § 2000e-5(f)(1).

Tenn. Code Ann. §§ 4-21-101 *et seq.*, permits plaintiffs to file discrimination claims either by (1) filing an administrative complaint with the Tennessee Human Rights Commission ("THRC") or (2) by filing suit directly and then filing a complaint with the THRC within one year of the alleged discriminatory action. *Jackson*, 961 F.2d at 579. Here, there is no indication in the record that White ever filed a discrimination complaint with the THRC, either before or after she filed this lawsuit. Accordingly, because White never utilized the deferral process otherwise available in Tennessee, the default 180-day limitation applies to her discrimination claim. White filed her First EEOC Charge on November 4, 2008. Therefore, her discrimination claim is limited to discrete discriminatory acts that occurred from May 8, 2008 forward. Similarly, the 180-day limitations period applicable to the Second EEOC Charge runs from July 18, 2008 forward.

There is at least a question of fact as to whether White suffered from some actionable discriminatory activity within 180 days of both the First EEOC Charge and the Second EEOC Charge. Viewing the record in the light most favorable to White, she continued to request the opportunity to rotate positions as a Warrant Clerk within 180 days of the First EEOC Charge and/or Second EEOC Charge. However, White's supervisors continued to refuse her requests to rotate, even after White complained to her supervisors and to Human Resources that she was not dyslexic, and even after the August 2008 Grievance Panel recommendation that she be permitted to rotate positions going forward. Although Metro Nashville argues that the court should regard White's discrimination claim as accruing when White first requested to join the rotation at an unspecified point in the early 2000's, the court is not persuaded that, under the circumstances presented here, the denials of later rotation requests do not constitute potentially actionable

discrete acts.

However, the court finds that the scope of White's discrimination claim must be limited in two respects. First, with respect to White's allegations of discrete acts of discrimination, only discrete discriminatory acts that took place within the requisite time frame – whatever that may be – are actionable.[10] Second, as discussed in the next section, the court finds that any potentially actionable discriminatory acts will be limited to denials of White's requests to rotate.

Subject to these qualifications, the evidence in the record is sufficient to establish a question of fact as to whether White suffered from actionable discrimination within the requisite time frame.

## B.    Discrimination Standard

The ADA bars employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1104-105 (6th Cir. 2008) (quoting 42 U.S.C. § 12112(a) (2008)).[11]

### 1.    Whether White Qualifies as "Disabled"

The parties dispute whether White qualifies as "disabled" under 42 U.S.C. § 12102(2)(C),

_____

[10]Given that the appropriate limitations period is not self-evident from the record, the parties will be permitted to brief that issue in advance of trial.

[11]In 2008, the ADA was modified by the ADAAA, which took effect on January 1, 2009. The Sixth Circuit has held that the ADAAA amendments do not apply retroactively to conduct occurring before that date. *Milholland v. Sumner Cnty. Bd. of Educ.*, 569 F.3d 562, 567 (6th Cir. 2009). White does not dispute Metro Nashville's contention that the version of the ADA in effect through December 31, 2008 governs her discrimination claim. (*See* Docket No. 33, Def. Mem. at p. 13-14.)

which affords protection against discrimination to any individual "regarded as" having a disability. An individual is "regarded as" disabled if "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999). "In both cases, it is necessary that a covered entity entertain misperceptions about the individual – it must believe either that *one has a substantially limiting impairment that one does not have* or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting. These misperceptions often 'result from stereotypic assumptions not truly indicative of . . . individual ability." *Id.* (citing 42 U.S.C. § 12101(7) (1999)) (emphases added).

Metro Nashville argues that, even if White has established that the MNPD believed that she had a disability, she has not shown that the MNPD regarded her as "substantially limited in one or more major life activities." Here, White argues that the MNPD wrongfully believed that she had dyslexia, which would have limited her ability to perform any functions involving extensive reading. The Sixth Circuit has expressly held that reading constitutes a "major life activity" under the pre-2009 version of the ADA, *see Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 626 (6th Cir. 2000), the EEOC has identified dyslexia as a specific learning disability in its Appendix to 29 C.F.R. § 1630.2(h)(2) – *see* 29 C.F.R. Pt. 1630, App., § 1630.2(j) – and at least two district courts within this circuit have found that, under appropriate factual circumstances, dyslexia qualifies as a "disability" under the ADA. *See Meekison v. Voinovich*, 17 F. Supp. 2d 725, 730-32 (S.D. Ohio Aug. 21, 1998), *rev'd in part on other grounds*, 67 F. App'x 900 (6th Cir. 2003); *Slick v. Onsted Cmty. Schs.*, No. 07-13727, 2009 WL 3185516 (E.D.

Mich. Sept. 4, 2009), *report rejected in part on other grounds*, 2009 WL 3185515, at *8 (E.D. Mich. Sept. 30, 2009).[12]  Accordingly, the court finds that there is at least a question of fact as to whether the MNPD "regarded" White as disabled.[13]

        2.    <u>Whether White Can Prove a Discrimination Claim</u>

           a.    Adverse Employment Action

Here, as a threshold matter, Metro Nashville contends that White did not suffer any materially adverse actions in the first place.  Adverse actions are often characterized "by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly *diminished material responsibilities*, or other indices *that might be unique to a particular situation*."  *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999) (emphases added); *see also Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002) ("Reassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions.") (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876 (6th Cir. 1996).)  Here, White avers that the Warrant Clerks typically rotated roles and responsibilities in the office and that, when she was hired, the job description provided for rotations through all of these different roles.

---

[12]In situations in which an individual actually *has* dyslexia, some district courts have held the issue of whether that condition actually substantially limits that individual's ability to engage in one or more major life activities may be a question of fact.  *See, e.g.*, *Stubbs v. Regents of Univ. of Cal.*, No. CIV S-06-1 LKK/DAD, 2007 WL 1532148, at *8 (E.D. Cal. May 25, 2007). Here, given record evidence that White's supervisors refused to transfer her to another position based on the assumption that her dyslexia (perhaps in combination with her ADHD) prevented her from assuming tasks that involved more reading, her perceived ailment qualifies as a "disability" under the "regarded as" prong without the need for factual findings.

[13]Some testimony in the record indicates that White herself informed her superiors that she had dyslexia and ADHD, and that, pursuant to White's own representations, she could not perform certain required work tasks.  If the jury credits that version of events, it would appear to fatally undermine White's claim that the MNPD unjustifiably regarded her as disabled.

However, she avers that, unlike the other Warrant Clerks, she was denied the ability to rotate positions because of the MNPD's mistaken belief that she suffered from dyslexia. She also avers that radio duty involves a role that is more isolated and stressful than the other roles in the office, with respect to which the Warrant Clerks typically share the burden. In essence, she contends that, because of her perceived disability, her supervisors denied her roles and responsibilities that Warrant Clerks otherwise enjoyed. By contrast, Metro Nashville argues that Warrant Clerks did not typically rotate positions and that, when White was hired for the day shift, she had no reasonable expectation of rotating roles, at least in part because the employee she was replacing had specifically been assigned to radio duty. Furthermore, Metro Nashville contends that the refusals to rotate did not impact White's salary, benefits, title, or work hours. Nevertheless, as the Sixth Circuit has acknowledged, what constitutes "adverse action" can be specific to particular factual circumstances, such as facts showing that an employee's material job responsibilities were materially diminished. Accordingly, under the circumstances presented here, the court finds that there is at least a dispute of material fact as to whether the denial of rotations constituted a materially adverse employment action.[14]

      b.      Proving Discrimination Directly or Through Circumstantial Evidence

A plaintiff can prove an ADA disability discrimination claim through direct evidence or through circumstantial evidence. Direct evidence of discrimination "is that evidence which, if believed, compels the conclusion that discrimination was a motivating factor in the employer's actions." *Jacklun v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.

---

[14]However, the court agrees with Metro Nashville that being "isolated" and "snubbed" do not constitute discrete adverse actions.

1999). Direct evidence does not require that the factfinder draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group. *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). In the absence of direct evidence of discrimination, a plaintiff's ADA discrimination claim proceeds under the traditional *McDonnell Douglas* burden-shifting framework. *Talley*, 542 F.3d at 1105. Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its actions. *Id.* If the defendant can satisfy this burden, the plaintiff must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination. *Id.* To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show (1) that she is disabled; (2) she was otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse action; (4) the employer knew or had reason to know of her disability; and (5) similarly situated non-disabled employees were treated more favorably. *See Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 660 (6th Cir. 1999); *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011).[15]

White has presented evidence of direct discrimination: she avers that her supervisors told her that she could not change roles because of her dyslexia, even though she is not dyslexic and never told anyone at work that she suffered from that condition. If the jury believes this account of events and is convinced that White's disability was the "but for" cause of the denial of her

---

[15]Prior to *Whitfield*, the Sixth Circuit had issued two lines of incongruent decisions concerning the appropriate ADA *prima facie* standard: one articulating a five-factor test, the other a three-factor test. In *Whitfield*, the Sixth Circuit clarified that the five-factor test is the appropriate standard. 639 F.3d at 259.

transfer requests – assuming that each timely denial constitutes an adverse employment action for ADA purposes – this evidence would not require any inference of discrimination. On the other hand, Metro Nashville argues that White herself professed to suffer from dyslexia and that, at any rate, Metro Nashville refused to rotate her for reasons other than dyslexia – *i.e.*, it would have refused to rotate her whether or not she was actually suffering from dyslexia. Based on these competing accounts, there is a disputed issue of material fact as to whether White suffered from discrimination because of a perceived disability.

Even without reference to direct evidence, White could establish a *prima facie* case of discrimination through circumstantial evidence.[16] There are disputed issues of fact as to whether she was regarded as disabled, whether she was otherwise qualified to handle other roles, whether the refusal to rotate her constituted an adverse employment action, and whether her supervisors would not rotate her because she was (unfairly) perceived as disabled. The parties also dispute whether Metro Nashville treated the other Warrant Clerks more favorably than White.

In response to this *prima facie* case, Metro Nashville has offered a legitimate, non-discriminatory reason for the refusal to rotate White: given White's past work performance and her repeated statements that she has a learning disability, her supervisors believed that the radio position was the most suitable job assignment for her. Furthermore, Metro Nashville argues that it would have made the same decision even without regard to whether White suffered dyslexia. (*See* Roller Decl., Docket No. 29, at ¶ 15.)

White offers a competing version of the facts, arguing that she never told anyone that she

---

[16]If a jury does not believe the plaintiff's proffered direct evidence of discrimination, then the evidentiary framework of *McDonnell Douglas* is the proper mode of analysis. *Terbovitz v. Fiscal Court of Adair County, Ky.*, 825 F.2d 111, 115 n.3 (6th Cir. 1987)

was dyslexic and repeatedly told her supervisors that she did not suffer from an impairment that would limit her in performing the other Warrant Clerk responsibilities. Ultimately, White will need to show that her perceived dyslexia was the "but for" cause of MNPD's decision. *See Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012) ("The ADEA and the ADA bar discrimination 'because of' an employee's age or disability, meaning that they prohibit discrimination that is a 'but-for' cause of the employer's adverse decision.") (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009)). Based on the record before the court, White may have an uphill climb to meet this burden. Nevertheless, although it is a close call, the court finds that there is disputed issue of fact as to whether the MNPD's non-discriminatory reasons for refusing to rotate White constituted a pretext for discrimination.

## III.   <u>Hostile Work Environment</u>

Under the ADA, a hostile work environment claim requires a plaintiff to demonstrate five elements: (1) she was disabled; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable. *Plautz v. Potter*, 156 F. App'x 812, 818 (6th Cir. 2005); *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002). For a plaintiff to have suffered from a hostile work environment, the plaintiff's workplace must have been "permeated with discrimination intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Plautz*, 156 F. App'x at 818-19 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). Also, to establish discriminatory harassment, "[a]n employee must demonstrate that the

harassment was motivated by a bias towards the employee's protected class." *Trepka*, 28 F. App'x at 461.

Here, White avers that, over an extended period of time, Sergeant Garafola repeatedly and unfairly denigrated her about the quality of her work and her capacity to perform other Warrant Clerk functions because she was purportedly dyslexic. She avers that, at times, he did so in front of other employees, causing her to feel harassed and intimidated. She also avers that, despite her repeated protestations that she is not dyslexic, Lieutenant Tindell and Sergeant Garafola continued to make statements in front of her co-workers that she was dyslexic and that she had been restricted to radio duty on the basis of that condition. Another witness, Officer Mann, corroborates White's account that Sergeant Garafola had singled White out for particularized negative treatment. White also avers that, unlike other Warrant Clerks, she was forced to take her radio transmitter into the bathroom with her, a directive that she found to be inappropriate and shameful in the eyes of her co-workers. She argues that, as a result of the negative comments related to her disability and the other actions by her superiors, her co-workers began to shun her and isolate her. These allegations are sufficient to create a disputed issue of material fact as to whether the conditions in her workplace were sufficiently severe and pervasive to constitute a hostile work environment.

As to the causation element, Metro Nashville argues that the supervisors' conduct towards her was not motivated by the perception that White suffered from dyslexia, but "perhaps" by other reasons, such as White's "tone," the fact that she "tattled" on other Warrant Clerks, and/or "because that was their personality." The merits of these arguments, which concern the true motivation for the actions of White's supervisors and the MNPD, will be for the jury to decide.

**IV.    Retaliation Claim**

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a) (2008). Retaliation claims are treated the same whether brought under the ADA or Title VII, *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997), and follow the *McDonnell Douglas* burden-shifting framework. *See Jones W. Reserve Transit Auth.*, 455 F. App'x 640, 646 (6th Cir. 2012). To establish a claim for retaliation under the ADA, a plaintiff must show the following: (1) she engaged in protected activity; (2) the defendant took an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse action.[17]

Metro Nashville argues that White has not shown (1) that the MNPD took any adverse actions against her after she engaged in protected activity, or (2) even assuming that it took otherwise actionable adverse actions against White, those actions were unrelated to the fact that White had engaged in protected activity. With respect to the first point, White argues that the refusal to insert her into the Warrant Clerk rotation, the disciplinary actions taken against her by the MNPD with respect to the *Milligan* incident, and the negative performance evaluation she received from Sergeant Garafola constituted adverse actions. The disciplinary actions, which included a seven-day suspension without pay – later reduced to a four-day suspension on the basis that it was "excessive" – plainly constitute adverse employment actions. The court has

_____

[17]For purposes of White's retaliation claim, Metro Nashville does not dispute that White engaged in activity protected by the ADA or that Metro Nashville was aware of those activities. Indeed, White's filing the First and Second EEOC charges against the MNPD/Metro Nashville indisputably constitute protected activity. Furthermore, White's grievance concerning Sergeant Garafola and/or her representations to the MNPD administrative bodies while pursuing that grievance – in which she complained that Sergeant Garafola was mistreating her at least in part because he believed she suffered from dyslexia – as well as her request for an appeal of her suspension, also likely constituted protected activity.

already found that there is a disputed issue of fact concerning whether the refusal to rotate White constituted an adverse employment action. Finally, issuing a negative performance evaluation also can constitute an adverse employment action if it "significantly impacts an employee's wages or professional advancement," *Blizzard v. Marion Tech. College*, 698 F.3d 275, 290 (6th Cir. 2012), although the parties have not briefed the issue here.[18]

As to the causation element, White's evidence is circumstantial and largely reliant on the temporal proximity between her protected activity and the alleged adverse actions. For example, the MNPD did not charge White with a policy violation until after she filed a grievance against Sergeant Garafola, then added a second charge and associated increased penalties just after White filed her First EEOC Charge. Furthermore, soon after filing her internal complaint and the First EEOC Charge, Sergeant Garafola issued her an uncharacteristically negative performance evaluation. White has also averred that Sergeant Garafola's allegedly harassing conduct got worse after she filed the complaint against him and the EEOC charge. Whether an adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. *See Singfield v. Akron Metro Housing Auth.*, 389 F.3d 555, 563 (6th Cir. 2004); *Howington v. Quality Rest. Concepts, LLC*, 298 F. App'x 436, 444 (6th Cir. 2008). Under the circumstances presented here, including the temporal proximity between the protected activity and the other indicia of potential discrimination, the court finds that White has established a *prima facie* case of retaliation.

In response, Metro Nashville offers some potentially persuasive arguments as to why

---

[18]The MNPD ultimately rescinded Sergeant Garafola's initial December 2008 performance evaluation. It is not clear from the existing record whether, if the initial evaluation had not been rescinded, White's wages or professional advancement would have been significantly impacted.

White's alleged disability played no role in the MNPD's decision to keep her on radio duty or to discipline her. For example, they argue that White's supervisors simply continued to refuse to rotate her for the same reasons as before, that the MNPD ultimately rescinded the negative employment evaluation, and that the MNPD's decision to pursue disciplinary action against White was motivated by an investigation stemming purely from the *Milligan* case, entirely without regard to White's protected activity. These arguments meet Metro Nashville's burden of production to offer legitimate, non-discriminatory reasons for the alleged adverse actions.

In rebuttal, White argues that the MNPD's proffered reasons are pretext for retaliation for engaging in protected activity. Certainly, Metro Nashville has offered plausible explanations for why it initiated the disciplinary proceedings against White, why it later pursued the seven-day suspension, why no other employees involved in the *Milligan* incident were disciplined, and why all of these actions were undertaken independently of the fact that White had engaged in protected activity. On the other hand, just after White engaged in protected activity, the MNPD unilaterally increased the charges against her and initially issued an "excessive" seven-day suspension. Furthermore, the negative performance evaluation that Sergeant Garafola issued to White in December 2008, not long after she had filed grievances against Sergeant Garafola and the EEOC charge against the MNPD, was inconsistent with previous acceptable performance evaluations. Although Metro Nashville characterizes the MNPD's decision to rescind that evaluation as essentially a "paperwork" issue, that explanation may not be sufficient to convince a jury that Sergeant Garafola had not acted with discriminatory animus towards White for engaging in protected activity. Furthermore, even if true, it would not independently explain or justify why, in White's version of events, the severity of Sergeant Garafola's harassing conduct increased after White engaged in protected activity. Of course, it is entirely possible that

Sergeant Garafola had a personality conflict with White or that he was retaliating against her for some reason other than the fact that she had engaged in protected activity.

Based on these considerations and the remainder of the record presented here, the true motivations of the MNPD and/or Sergeant Garafola (acting thereunder) are not appropriate for resolution at the summary judgment stage. As the EEOC found in the pre-litigation phase of this case, this court finds that the record is sufficient to create a potential inference of pretext. Thus, it will be for the jury to determine whether the MNPD and its officers actually acted with retaliatory animus.

## CONCLUSION

For the reasons stated herein, Metro Nashville's Motion for Summary Judgment will be granted in part and denied in part. White's failure to accommodate claim will be dismissed with prejudice, White's discrimination claim will be limited to denials of rotation requests that occurred within the relevant limitations period, and White's hostile work environment claim and retaliation claim will proceed.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge